UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
DRAGON STATE INTERNATIONAL                :
LIMITED,                                  :
                                          :        Case No. 1:14-cv-08591 (PAC)
                     Plaintiff,           :
                                          :
        -against-                         :
                                          :
KEYUAN PETROCHEMICALS,                    :
INC., CHUNFENG TAO, and                   :
AICHUN LI,                                :
                                          :
                     Defendants.          :
--------------------------------------------------------- X

## FIRST AMENDED COMPLAINT

Plaintiff Dragon State International Limited ("Dragon State"), by it undersigned counsel, as and for its first amended complaint against Defendants Keyuan Petrochemicals, Inc. ("Keyuan"), Chunfeng Tao ("Tao") and Aichun Li ("Li", collectively with Tao and Keyuan, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.     Defendant Keyuan is a petrochemical company with its headquarters and operations in the People's Republic of China ("PRC"). Defendant Tao is the Chairman of the Board and Chief Executive Officer of Keyuan. Defendant Li was the Chief Financial Officer of Keyuan from May of 2010 until her resignation from Keyuan on October of 2011.

2.     Plaintiff Dragon State is a Local Limited Company (private company) registered in Hong Kong and is solely owned by non-party Prax Capital ("Prax"), a China-focused private equity fund.

3.     In September of 2010, Dragon State purchased certain Keyuan securities: preferred convertible stock and warrants for $20 million. In connection with Keyuan's sale of its securities to Dragon State, Defendants made false and misleading statements, and omitted material information, to induce Dragon State to purchase the Series B Preferred Convertible Stock and warrants of Keyuan. These false and misleading statements and omissions were made in the representations, warranties, and covenants of a stock purchase agreement and survived the execution of said agreement through the date herein.

4.     Defendants knew, or were reckless in not knowing, that the representations and warranties made by Keyuan to induce Dragon State to purchase Keyuan securities were false and misleading. Nevertheless, Defendants intentionally or recklessly made such false and misleading statements to induce Dragon State to invest $20 million into Keyuan. Dragon State relied upon these false and misleading statements and omissions and was injured thereby. Rather than receiving the benefit of the securities for which Dragon State bargained, the securities acquired by Dragon State based upon the false and misleading representations and warranties have little, if any, value. But for the false and misleading statements and omissions, Dragon State would not have purchased the Keyuan securities.

5.     On September 24, 2013, Keyuan, Tao and Dragon State entered into a tolling agreement (the "Tolling Agreement") pursuant to which the parties agreed that:

> [a]ll periods of limitation, repose and laches … which are or may be applicable to any or all claims and remedies at contract, tort and statute, including but not limited to all claims arising out of the Securities Purchase Agreement dated September 28, 2010 and out of Dragon State's purchase of the securities of Keyuan, whether described herein or not … that Dragon State has or may have against the Keyuan Parties are tolled and suspended as of the Effective Date through and including the Termination Date as hereinafter defined.

2

6.      The parties agreed that the survival date of the representations and warranties contained in the SPA, as set forth in Section 7.14 of the SPA, were extended through September 28, 2014.

7.      The parties also agreed that Keyuan would extend: (a) the mandatory conversion date of the Series B Preferred Stock purchased by Dragon State from September 28, 2013 to September 28, 2014; and (b) the expiration date of each of the Series C and Series D Warrants from September 28, 2013 to September 28, 2014.

8.      On September 9, 2014, Keyuan, Tao and Dragon State entered into an amended Tolling Agreement pursuant to which the parties agreed to extend the Tolling Agreement to October 31, 2014.

9.      In a consent order entered into by the parties and so ordered by the Court on October 30, 2014, Keyuan and Tao agreed that pending resolution of this case they would (a) toll the maturity of the Series B Preferred Stock and not convert, or allow for the conversion of, the Series B Preferred Stock, and (b) toll the expiration of the Series C and D warrants.  (Case No 1:14-cv-08591-PAC, Doc. No. 3.)

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act, and Rule 10b-5 promulgated thereunder.

11.     This court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act, 15 U.S.C. §§ 78aa, and 28 U.S.C. § 1331.

12.     This court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 because the federal claims and the state claims form part of the same case or controversy.

13.     Venue is proper in this Judicial District pursuant to Section 27 of the Securities and Exchange Act, 15 U.S.C. §§ 78aa, and 28 U.S.C. § 1391(b) and pursuant to Section 7.2 of the SPA, pursuant to which Keyuan, including its officers Tao and Li, agreed to submit the jurisdiction of the United States District Court, Southern District of New York.

14.     In connection with the acts, conduct, and other wrongs alleged in this first amended complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

### PARTIES

15.     Plaintiff Dragon State is a Local Limited Company (private company) registered in Hong Kong with its principal offices at Suite 1791, Shui On Plaza, 333 Huai Hai Zhong Road, Shanghai 200021, P.R. China.  Dragon State is solely owned by non-party Prax Capital ("Prax"), a China-focused private equity fund.

16.     Defendant Keyuan is a Nevada corporation with its principal offices located at Qingshi Industrial Park, Ningbo Economic & Technological Development Zone, Ningbo, Zhejiang Province, P.R. China, 315803.  Keyuan is a manufacturer and supplier of petrochemical products.  At all relevant times, Keyuan's common stock was registered with the Securities Exchange Commission pursuant to Section 12(g) of the Securities Exchange Act of 1934 ("Exchange Act"), and traded on the NASDAQ Stock Market.

17.     Defendant Tao is the Chairman of the Board and Chief Executive Officer of Keyuan. Tao indirectly controls approximately 34.52% of Keyuan's common stock.  Tao signed and certified the accuracy of the two materially false and misleading Form 10-Qs.  Tao was aware that the financial statements omitted material information about third party transactions

because Tao, or companies controlled by Tao, were parties to related party transactions. Tao participated in negotiating the terms of the SPA. Tao signed the SPA in New York. Tao is a control person of Keyuan.

18.    Defendant Li was the Chief Financial Officer of Keyuan from May of 2010 until her resignation from Keyuan on October of 2011. Li was a certified public accountant licensed to practice in the State of North Carolina. In her role as Chief Financial Officer, Li was responsible for overseeing Keyuan's financial reporting process including the preparation of its quarterly and annual financial statements. Li signed and certified the accuracy of the two materially false and misleading Form 10-Qs. Li was aware that the financial statements omitted material information about third party transactions because Li, who was hired to ensure Keyuan's compliance with United States generally accepted accounting principles and oversee the SEC reporting process, received information indicating that Keyuan was engaged in certain related party transactions.

## SUBSTANTVE ALLEGATIONS

19.    Keyuan is a China-based company headquartered in Ningbo, Zhejiang Province, China engaged in business through its wholly-owned subsidiary Ningbo Keyuan Plastics Co, Ltd. ("Ningbo Keyuan Plastics") located in Ningbo. Tao founded Ningbo Keyuan Plastics in 2007 with two business partners. Ningbo Keyuan Plastics commenced operations in late 2009.

20.    In April of 2010, Prax and Keyuan entered into negotiations concerning the purchase of Keyuan securities through a private offering. Keyuan was represented by Tripoint Global Equities, LLC ("Tripoint"), a financial advisor located in New York, New York, who led the negotiations.

21.     In April of 2010, representatives from Prax visited Keyuan and took a tour of the facility in Ningbo.  Shortly thereafter, Keyuan, Prax, and Tripoint entered into a term sheet prepared by Tripoint that described, for negotiation purposes only, the key terms the parties had discussed.

22.     Over the next few months, Prax undertook due diligence of Keyuan and its business.  This included retaining PriceWaterHouseCoopers ("PWC") in June of 2010 to prepare a due diligence report on the business, financial and tax affairs of Keyuan, which included a review of Keyuan's audited and unaudited financial statements.

**The Securities Purchase Agreement**

23.     In mid-September of 2010, Tao and a representative of Dragon State flew to New York to celebrate Keyuan's uplisting to the NASDAQ.  On September 16, 2010, Tao presided over the NASDAQ Closing Bell.  At the end of that day, Keyuan's stock closed at an adjusted close price of $5.26.

24.     On September 28, 2010, in New York City, Keyuan and Dragon State signed a Securities Purchase Agreement dated September 28, 2010 with exhibits ("SPA").  A true and correct copy of the Purchase is attached hereto as Exhibit "1".

25.     Pursuant to the SPA, Dragon State acquired units ("Units"), each Unit consisting of (i) ten (10) shares of Keyuan's Series B Convertible Preferred Stock, par value $0.001 per share (the "Preferred Shares"), initially convertible into ten (10) shares of Keyuan's common stock, par value $0.001 per share (the "Common Stock") (subject to adjustment), and (ii) a Series C Warrant (the "Series C Warrant") and a Series D Warrant (the "Series D Warrant" and, together with the Series C Warrant, the "Warrants"), with each of the Warrants exercisable to purchase the number of shares of Common Stock equal to fifteen percent (15%) of the aggregate

number of shares of Common Stock offered in the Units and underlying the Preferred Shares purchased by each Purchaser (the "Financing Transaction"). (Ex. 1., at p. 1.)

26.     As reflected in Exhibit A to the SPA, Dragon State purchased 533,334 Units, each consisting of 10 shares and 1.5 of each of the Series C and D warrants, aggregating to 5,333,334 shares of Series B Preferred Stock, 800,001 Series C Warrants, and 800,001 Series D Warrants (collectively, the "Securities"), for a total of twenty million dollars ($20,000,000). (Ex. 1, at Ex. A.)

27.     Pursuant to the Series B Certificate of Designations, Exhibit C to the SPA, all outstanding shares of the Series B Preferred Stock was subject to a mandatory conversion to common stock on September 28, 2013. The quotient for the conversion of the Series B Preferred Stock equal to the quotient of (i) the Series B Liquidation Preference Amount (defined as $3.75 per share) of the shares of Series B Preferred Stock divided by (ii) the Conversion Price (defined as $3.75 per share.) Pursuant to the parties' Tolling Agreement, the mandatory conversion date was extended until September 28, 2014. Pursuant to the parties' Amended Tolling Agreement, the mandatory conversion date was extended until October 31, 2014

28.     The Series C Warrant expires three (3) years following the Closing Date (which is defined as September 30, 2013), with an initial exercise price of $4.50, and the Series D Warrant expires three (3) years following the Closing Date, with an initial exercise price of $5.25. Pursuant to the parties' Tolling Agreement, as amended, the expiration date of the Series C and D Warrants was extended until October 31, 2014.

29.     Dragon State specifically bargained for the Conversion Price and the Series C and D Warrants exercise prices based upon the historical performance of Keyuan's stock. In the two months before the parties entered into the SPA, Keyuan's stock closed at between an adjusted

price of $3.95 and $5.26.  However, unbeknownst to Dragon State, the price of Keyuan's stock was artificially inflated as a result of false statements, misrepresentations and omissions in its financial statements filed with the SEC.  Thus, Dragon State did not get the benefit for which it bargained.

30.    To induce Dragon State to enter into the SPA, Keyuan made numerous representations and warranties in the SPA.

31.    Keyuan represented and warranted that:

At the time of the respective filings, the Form 10-K and the Form 10-Q complied in all material respects with the requirements of the Exchange Act and the rules and regulations of the Commission promulgated thereunder and other federal, state and local laws, rules and regulations applicable to such documents.  As of their respective filing dates, none of the Form 10-K or Form 10-Q contained any untrue statement of a material fact; and none omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The financial statements of the Company included in the Commission Documents (the "Financial Statements") comply as to form in all material respects with applicable accounting requirements and the published rules and regulations of the Commission or other applicable rules and regulations with respect thereto. The Financial Statements have been prepared in accordance with United States generally accepted accounting principles ("GAAP") applied on a consistent basis during the periods involved (except (i) as may be otherwise indicated in the Financial Statements or the notes thereto or (ii) in the case of unaudited interim statements, to the extent they may not include footnotes or may be condensed or summary statements), and fairly present in all material respects the consolidated financial position of the Company as of the dates thereof and the results of operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments). (Exh. A § 2.1(f).)

32.    This representation and warranty was false at the time that it was made because, among other things, the Form 10-Q for the period ending June 30, 2010 omitted related party transactions, thus were not prepared in accordance with GAAP.

33.    Keyuan represented and warranted that:

Since June 30, 2010, neither the Company, the non-PRC Subsidiaries, nor the PRC Subsidiary has experienced or suffered any Material Adverse Effect. For the

purposes of this Agreement, "Material Adverse Effect" means any of (i) a material and adverse effect on the legality, validity or enforceability of this Agreement or the other Transaction Documents, (ii) a material adverse effect on the business, operations, properties, or financial condition of the Company, its non-PRC Subsidiaries, the PRC Subsidiary, individually, or in the aggregate and/or any condition, circumstance, or situation that would prohibit or otherwise materially interfere with the ability of the Company to perform any of its obligations under this Agreement or the other Transaction Documents in any material respect or (iii) an adverse impairment to the Company's ability to perform on a timely basis its obligations under this Agreement or the other Transaction Document. (*Id.* § 2.1(g).)

34.     This representation and warranty was false at the time that it was made. Among other things, the Form 10-Q for the period ending September 30, 2010 omitted related party transactions, thus were not prepared in accordance with GAAP. This adversely impaired Keyuan's ability to timely filed its 10-K for the year ending December 31, 2010, which, among other things, resulted in NASDAQ delisting Keyuan's stocks. It also resulted in an SEC investigation and the SEC filing a complaint against Keyuan and the filing of a class action litigation against Keyuan, all of which damaged Keyuan's reputation and operations.

35.     Keyuan represented and warranted that:

Other than as disclosed on Schedule 2.1(h) or set forth in the Commission Documents, to the knowledge of the Company, neither the Company, the non-PRC Subsidiaries, nor the PRC Subsidiary has any liabilities, obligations, claims or losses (whether liquidated or unliquidated, secured or unsecured, absolute, accrued, contingent or otherwise) other than those incurred in the ordinary course of the Company's, the non-PRC Subsidiaries' and the PRC Subsidiary's respective businesses since June 30, 2010 and those which, individually or in the aggregate, do not have a Material Adverse Effect on the Company, the non-PRC Subsidiaries or the PRC Subsidiary. (*Id.* § 2.1(h).)

36.     This representation and warranty was false at the time that it was made. As set forth in Keyuan's 10-K for the year ending December 31, 2010, Keyuan disclosed that it was changing its effective estimated tax rate to 25% and accounting for preferential tax treatment as other income instead of accounting for it as a tax credit. Further, as Keyuan admitted in the same

10-K, Keyuan had known liabilities that it did not disclose because it "engaged with certain related and other parties in short term financings to overcome the restrictions regarding the use of certain bank loans or to satisfy the banks' internal requirements to demonstrate the usage of the loans," and that "such practices may have been in violation of PRC banking laws."

37.     Keyuan represented and warranted that:

> To the Company's knowledge, no event or circumstance has occurred or exists with respect to the Company, the non-PRC Subsidiaries or the PRC Subsidiary or their respective businesses, properties, operations or financial condition, which, under applicable law, rule or regulation, requires public disclosure or announcement by the Company but which has not been so publicly announced or disclosed. (*Id.*, § 2.1(i).)

38.     This representation and warranty was false at the time that it was made because, among other things, the Form 10-Q for the period ending June 30, 2010 omitted related party transactions, which Keyuan was required to disclose.

39.     Keyuan represented and warranted that:

> The business of the Company, the non-PRC Subsidiaries and the PRC Subsidiary is not being conducted in violation of any federal, state, local or foreign governmental laws, or rules, regulations and ordinances of any governmental entity, except for possible violations which singularly or in the aggregate could not reasonably be expected to have a Material Adverse Effect.... (*Id.*, § 2.1(n).)

40.     This representation and warranty was false at the time it was made. As Keyuan admitted in its Form 10-K filed with the SEC on October 20, 2011, Keyuan "engaged with certain related and other parties in short term financings to overcome the restrictions regarding the use of certain bank loans or to satisfy the banks' internal requirements to demonstrate the usage of the loans," and that "such practices may have been in violation of PRC banking laws." Keyuan also admitted in the same 10-K that "[i]n the past we sometimes accommodated requests from our customers to change the name of products so that our customers could save on freight costs."

41.     Keyuan represented and warranted that:

Each of the Company, the non-PRC Subsidiaries and the PRC Subsidiary, to the extent its applicable, has accurately prepared and filed all federal, state and other tax returns required by law to be filed by it, has paid or made provisions for the payment of all taxes shown to be due and all additional assessments, and adequate provisions have been and are reflected in the consolidated financial statements of the Company for all current taxes and other charges to which the Company, the non-PRC Subsidiaries or the PRC Subsidiary, if any, is subject and which are not currently due and payable. None of the federal income tax returns of the Company have been audited by the Internal Revenue Service. The Company has no knowledge of any additional assessments, adjustments or contingent tax liability (whether federal, state or foreign) of any nature whatsoever, whether pending or threatened against the Company, any non-PRC Subsidiary or the PRC Subsidiary for any period, nor of any basis for any such assessment, adjustment or contingency. (*Id.*, § 2.1(p).)

42.     This representation and warranty was false at the time when it was made. As set forth in Keyuan's 10-K for the year ending December 31, 2010, Keyuan disclosed that it was changing its effective estimated tax rate to 25% and accounting for preferential tax treatment as other income instead of accounting for it as a tax credit. Keyuan knew, or should have known, that this adjustment would be necessary and failed to disclose it.

43.     Keyuan represented and warranted that:

Except as may have otherwise been disclosed in the Commission Documents, the books and records of the Company, the non-PRC Subsidiaries and the PRC Subsidiary accurately reflect in all material respects the information relating to the business of the Company, the non-PRC Subsidiaries and the PRC Subsidiary, the location and collection of their assets, and the nature of all transactions giving rise to the obligations or accounts receivable of the Company, the non-PRC Subsidiaries or the PRC Subsidiary. Except as disclosed on Schedule 2.1(s), the Company, the non-PRC Subsidiaries and the PRC Subsidiary maintain a system of internal accounting controls sufficient, in the judgment of the Company, to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability, (iii) access to assets is permitted only in accordance with management's general or specific authorization and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate actions are taken with respect to any differences. (*Id.*, § 2.1(s).)

11

44.     This representation and warranty was false at the time that it was made because, among other things, the Form 10-Q for the period ending June 30, 2010 failed to reflect related party transactions, which were material to the information relating to the business of Keyuan. Further, Keyuan conceded in its Form 10-K filed with the SEC on October 20, 2011 that Keyuan lacked adequate internal controls and that the "management has concluded that the Company continues to have material weaknesses…."

45.     Keyuan represented and warranted:

Any and all written or oral contracts, instruments, agreements, commitments, obligations, plans or arrangements, the Company, the non-PRC Subsidiaries and the PRC Subsidiary is a party to, that a copy of which would be required to be filed with the Commission as an exhibit to a registration statement on Form S-1 (collectively, the "Material Agreements") if the Company or any Subsidiary were registering securities under the Securities Act has previously been publicly filed with the Commission in the Commission Documents. Each of the Company, the non-PRC Subsidiaries and the PRC Subsidiary has in all material respects performed all the obligations required to be performed by them to date under the foregoing agreements, have received no notice of default and are not in default under any Material Agreement now in effect the result of which would cause a Material Adverse Effect. (*Id.*, § 2.1(t).)

46.     This representation and warranty was false at the time that it was made because, among other things, Keyuan's Form 10-Q for the period ending June 30, 2010 failed to disclose numerous related party transactions involving agreements with related parties for the sales of products, purchase of raw material, purchase of transportation services, credit line of guarantee provision for bank borrowings, short-term financing from related parties, and short-term financing to related parties.

47.     Keyuan represented and warranted that:

Except as set forth in the Financial Statements or in the Commission Documents or on Schedule 2.1(u), there are no loans, leases, agreements, contracts, royalty agreements, management contracts or arrangements or other continuing transactions between (a) the Company, any of its non-PRC Subsidiaries, or the

PRC Subsidiary on the one hand, and (b) on the other hand, any officer, employee, consultant or director of the Company, any of its non-PRC Subsidiaries or the PRC Subsidiary, or any person owning any capital stock of the Company, any of its non-PRC Subsidiaries, or the PRC Subsidiary, or any member of the immediate family of such officer, employee, consultant, director or stockholder or any corporation or other entity controlled by such officer, employee, consultant, director or stockholder, or a member of the immediate family of such officer, employee, consultant, director or stockholder. (*Id.*, § 2.1(u).)

48.   This representation and warranty was false at the time that it was made because, among other things, Keyuan's Form 10-Q for the period ending June 30, 2010 failed to disclose numerous related party transactions.

49.   Keyuan represented and warranted that

Assuming the accuracy of the representations of the Purchasers set forth in Section 2.2 (d)-(i) hereof, the Company has complied with all applicable federal and state securities laws in connection with the offer, issuance and sale of the Units hereunder. Neither the Company nor anyone acting on its behalf, directly or indirectly, has sold or will sell, offer to sell or solicit offers to buy any of the Units, the Preferred Shares, the Warrants or similar securities to, or solicit offers with respect thereto from, or enter into any preliminary conversations or negotiations relating thereto with, any person, or has taken or will take any action so as to bring the issuance and sale of any of the Units, the Preferred Shares and the Warrants in violation of the registration provisions of the Securities Act and applicable state securities laws, and neither the Company nor any of its affiliates, nor any person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D under the Securities Act) in connection with the offer or sale of any of the Units, the Preferred Shares and the Warrants. (*Id.*, § 2.1(v).)

50.   This representation and warranty was false at the time it was made because at the time that the parties entered into the SPA, Keyuan has filed materially false financial statements with the SEC.

51.   Keyuan represented and warranted that:

Except as disclosed on Schedule 2.1(y), since June 30, 2010, other than in the ordinary course of business, neither the Company, the non-PRC Subsidiaries, nor the PRC Subsidiary have... (ii) borrowed any amount or incurred or become subject to any liabilities (absolute or contingent) except current liabilities incurred

in the ordinary course of business which are comparable in nature and amount to the current liabilities incurred in the ordinary course of business during the comparable portion of its prior fiscal year, as adjusted to reflect the current nature and volume of the business of the Company, the non-PRC Subsidiaries and the PRC Subsidiary... [or] (x) entered into any other transaction other than in the ordinary course of business, or entered into any other material transaction, whether or not in the ordinary course of business.... (*Id.*, § 2.1(y)(ii), (x).)

52.     This representation and warranty was false at the time it was made because, as reflected in its Restated Form 10-Q for the period ending September 30, 2010, Keyuan had been engaging in related party transactions, which included "engag[ing] with certain related and other parties in short term financings to overcome the restrictions regarding the use of certain bank loans or to satisfy the banks' internal requirements to demonstrate the usage of the loans," and failed to disclose this information to Dragon State.

53.     Keyuan represented and warranted that:

The Company is in compliance with the applicable provisions of the Sarbanes-Oxley Act of 2002 ["SOX"]... and the rules and regulations promulgated thereunder, that are effective and for which compliance by the Company is required as of the date hereof. (*Id.*, § 2.1(cc).)

54.     This representation and warranty was false at the time that it was made because, among other things, Keyuan's Form 10-Q for the periods ending June 30, 2010 failed to disclose numerous related party transactions.

55.     Keyuan represented and warranted that:

Except as specified in the Commission reports, the Company has not, in the two years preceding the date hereof, received notice from any Trading Market to the effect that the Company is not in compliance with the listing maintenance requirement thereof. The Company is, and has no reason to believe that it will not in the foreseeable future continue to be, in compliance with the listing and maintenance requirements for continued listing of the Common Stock on the Trading Market on which the Common Stock is currently listed or quoted. The issuance and sale of the Units under this Agreement and the Transaction Documents do not contravene the rules and regulations of the Trading Market which the Common Stock is currently listed or quoted, and, except as otherwise set forth in the Transaction Documents, no approval of the stockholders of the

14

Company thereunder is required for the Company to issue and deliver to the Purchasers the Units contemplated by this Agreement and the Transaction Documents. "Trading Market" means whichever of the New York Stock Exchange, NYSE Amex, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market or OTC Bulletin Board on which the Common Stock is listed or quoted for trading on the date in question. (*Id.*, § 2.1(ff).)

56.     This representation and warrant was false at the time it was made.   Keyuan intentionally omitted related party transactions on its Form 10-Qs for the periods ending June 30, 2010 and September 30, 2010 and knew that these financial statements were not prepared in accordance with GAAP.  Thus, Keyuan had reason to believe that its accountants might discover the related party transactions, which could delay Keyuan timely filing its financial statements with the SEC, which would violate the NASDAQ listing and maintenance requirements for continued listing of Keyuan's common stock on NASDAQ.

57.     Keyuan represented and warranted that:

All disclosure provided to the Purchasers regarding the Company, any non-PRC Subsidiary and the PRC Subsidiary or their respective businesses and the transactions contemplated hereby, furnished by or on behalf of the Company (including the Company's representations and warranties set forth in this Agreement and the disclosure set forth in any diligence report or business plan provided by the Company or any person acting on the Company's behalf) are true and correct in all material aspects and do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.  (*Id.*, § 2.1(jj).)

58.     This representation and warrant was false at the time it was made because Keyuan's financial statements omitted the material fact that Keyuan engaged in related party transactions and also because Keyuan's other representations and warranties, as described above, were contained untrue statements of material fact.

59.     Keyuan represented and warranted that:

> Neither the Company, the non-PRC Subsidiaries, or the PRC Subsidiary, nor to the knowledge of the Company, the non-PRC Subsidiaries, or the PRC Subsidiary, any agent or other person acting on behalf of the Company, the non-PRC Subsidiaries or the PRC Subsidiary, has, directly or indirectly... violated in any material respect any provision of the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder which was or is applicable to the Company, any of its non-PRC Subsidiaries and the PRC Subsidiary. (*Id.*, § 2.1(mm).)

60.     This representation and warrant was false at the time it was made because the Foreign Corrupt Practices Act requires companies to make and keep books and records that accurately and fairly reflect the transactions of the corporation and to devise and maintain an adequate system of internal accounting controls. Keyuan was in violation of the Foreign Corrupt Practices Act because its Form 10-Q for the period ending June 30, 2010 did not reflect related party transactions and Keyuan has admitted in filings with the SEC that it did not maintain an adequate system of internal accounting controls.

61.     To induce Dragon State to enter into the SPA, Keyuan also made certain covenants for the benefit of Dragon State including:

> The Company shall (a) comply in all respects with its reporting and filing obligations under the Exchange Act, (b) comply with all requirements related to any registration statement filed pursuant to the Registration Rights Agreement, and (c) not take any action or file any document (whether or not permitted by the Securities Act or the rules promulgated thereunder) to terminate or suspend such registration or to terminate or suspend its reporting and filing obligations under the Exchange Act or Securities Act except as permitted under the Transaction Documents... (*Id.*, § 3.2.)

62.     Keyuan admitted that it breached this covenant. Keyuan admitted that it could not timely file its 10-K for the year ended December 31, 2010 and when it finally filed its 10-K it admitted that it failed to make material disclosures about related party transactions in its Form 10-Qs for the periods ending June 30, 2010 and September 30, 2010.

63.     Keyuan also made the following covenant for the benefit of Dragon State: "The Company shall comply, and cause each non-PRC Subsidiary and the PRC Subsidiary to comply in all respects, with all applicable laws, rules, regulations and orders, except for such non-compliance which singularly or in the aggregate could not reasonably be expected to have a Material Adverse Effect." (*Id.*, § 3.3.)

64.     Keyuan has admitted that it breached this covenant. In its October 20, 2011 10-K, Keyuan admitted that it may have violated the banking laws of the PRC and the United States in connection with the related party transactions. Further, Keyuan's Form 10-Qs for the period ending June 30, 2010 and September 30, 2010 failed to comply with GAAP by omitting related party transactions, requiring Keyuan to file restated Form 10-Qs.

65.     Keyuan also made the following covenant for the benefit of Dragon State:

The Company shall keep and cause each non-PRC Subsidiary and the PRC Subsidiary to keep adequate records and books of account, in which complete entries will be made in accordance with GAAP consistently applied, reflecting all financial transactions of the Company, the non-PRC Subsidiaries and the PRC Subsidiary, and in which, for each fiscal year, all proper reserves for depreciation, depletion, obsolescence, amortization, taxes, bad debts and other purposes in connection with its business shall be made. (*Id.*, § 3.4.)

66.     Keyuan admitted that it breached this covenant. Keyuan admitted in the Form 8-K filed with the SEC on October 20, 2011 that the failure to disclose the additional related party transactions was a material violation of GAAP requiring Keyuan to restate its financial statements.

67.     Keyuan also made the following covenant for the benefit of Dragon State:

So long as a Purchaser beneficially owns any of the Shares, the Company shall timely file all reports required to be filed with the Commission pursuant to the Exchange Act, and the Company shall not terminate its status as an issuer required to file reports under the Exchange Act even if the Exchange Act or the rules and regulations thereunder would permit such termination. (*Id.*, § 3.12.)

68.     Keyuan admitted breaching this covenant.  As a result of its filing of false and misleading financial statements, Keyuan failed to timely file its 10-K for the year ending December 30, 2010.

69.     Keyuan also made the following covenant for the benefit of Dragon State: "The Company shall be in compliance with the applicable provisions of [SOX], and the rules and regulations promulgated thereunder, as required under such Act." (*Id.*, § 3.17.)

70.     Keyuan admitted to breaching this covenant.  Keyuan's Form 10-Qs for the periods ending June 30, 2010 and September 30, 2010 failed to disclose numerous related party transactions, as admitted by its subsequent SEC filings.

71.     Section 7.14 of the SPA provides that the "representations and warranties of [Keyuan] hereunder and under the other Transaction Documents shall survive the execution and delivery hereof and the Closing hereunder for a period of three (3) years following the Closing Date," September 30, 2010.  (Ex. 1 at § 1.4, 7.14.)  That survival period was subsequently extended for approximately one additional year, until September 28, 2014, pursuant to a tolling agreement that the parties entered into on September 24, 2013.

72.     In its 10-Ks for the years ended December 31, 2011 and December 31, 2012, Keyuan continued to disclose related party transactions.  Thus, Keyuan continued to be in breach of the same representations and warranties through the survival period.

73.     Further, pursuant to Section 6.1, Keyuan agreed:

> to indemnify and hold harmless [Dragon State] (and their respective directors, officers, managers, partners, members, shareholders, affiliates, agents, successors and assigns) from and against any and all losses, liabilities, deficiencies, costs, damages and expenses (including, without limitation, reasonable attorneys' fees, charges and disbursements) incurred by the [Dragon State] as a result of any breach of the representations, warranties or covenants made by the Company herein.  (Ex. 1 at § 6.1.)

18

74.     Section 7.2(b) of the SPA, provides that Keyuan and Dragon State irrevocably submits to the jurisdiction of the United States District Court sitting in the Southern District of New York. (Ex. 1 at § 7.2(b).)

75.     The SPA is governed by New York law. (Ex. 1 at § 7.9.)g

**GAAP Required Keyuan to Disclose the Related Party Transactions**

76.     SEC and NASDAQ rules and regulations require that publicly traded companies such as Keyuan include financial statements prepared in accordance with Generally Accepted Accounting Principles ("GAAP") in their annual and quarterly reports filed with the SEC. *See* Section 13 of the Exchange Act; Rule 10-01(d) of Regulation SX.

77.     SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1)2 (emphasis added).

78.     Management retains responsibility for preparing financial statements that conform with GAAP. The American Institute of Certified Public Accountants ("AICPA") Professional Standards provide:

> The financial statements are management's responsibility . . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. . . . Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

AIPCA, Professional Standards, vol. 1, AU § 110.02 (1998).

79.     The SPA, negotiated and signed by Tao, contained representations and warranties that Keyuan's financial statements had been prepared in accordance with GAAP. (Exh. A, § 2.1(f).)

80.     The SPA, negotiated and signed by Tao, contained a covenant that Keyuan would keep adequate records and books of account with entries made in accordance with GAAP. (*Id.*, § 3.4.)

81.     Tao and Li, as CEO and CFO respectively of Keyuan, were responsible for preparing financial statements that conformed with GAAP.

82.     Financial Accounting Standards Board ("FASB") Accounting Standards and SEC regulation S-K required the Company to disclose all material related party transactions. Specifically, at the time of the events herein, SFAS No. 57 and No. 850 provide that a public company's "[f]inancial statements shall include disclosures of material related party transactions." SFAS No. 57 ¶ 2; 850-10-50-1.

83.     "Related party transactions" include those between a "parent company and its subsidiaries "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." *Id.*.

84.     "Affiliate" includes any company that is under common control or management with the public company. *Id.*.

85.     Disclosures of related party transactions shall include (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related

parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. *Id.*

86.     The SPA, negotiated and signed by Tao, contained a representation and warranty that, except as set forth in the financial statements, Keyuan had not engaged in related party transaction. (Exh. A, § 2.1(u).)  The related party transactions that Keyuan failed to disclose included transactions with Tao and companies controlled by Tao.

87.     Li, the Chief Financial Officer of Keyuan at the time that is issued the 10Qs at issue and entered into the SPA, was a Certified Public Accountant.  As such, she knew, or was reckless in not knowing, that GAAP required Keyuan to disclose the related party transactions

**Tao and Li Concealed the Related Party Transactions**

88.     Pursuant to Generally Accepted Auditing Standards ("GAAS") AU 333 and 334, as part of each annual audit, a company's auditor is required to inquire with each senior officer and each director as to the existence of any related party transactions with the Company.  These representations made during an audit may be both written and oral, but the auditor is also required to obtain written representations from management. (AU 333.02-03.)

89.     GAAS AU 560 requires a company's auditor to inquire of management whether the company has entered into any material transactions that must be listed as subsequent events in the financial statements pursuant to GAAP and SEC regulations.

90.     The written representations from management ("Management Representation Letters") are to be signed by:

> those members of management with overall responsibility for financial and operating matters whom the auditor believes are responsible for and knowledgeable about, directly or through others in the organization, the matters covered by the representations. Such members of management normally include the *chief executive officer* and *chief financial officer* or others with equivalent positions in the entity.

AU 333.09 (emphasis added.)

91.     Tao, as Keyuan's CEO, and Li, as Keyuan's CFO, had the responsibility to review and sign the Management Representation Letters, which required them to represent to Keyuan's independent auditors during each reporting period that as of that date, among other things, that all related party transactions had been disclosed.

92.     Keyuan's Form 10-Q for the period ending June 30, 2010 and Form 10-Q for the period ending September 30, 2010 did not disclose related party transactions. Thus, Tao and Li would have had to knowingly sign Management Representation Letters that failed to disclose related party transactions, despite the obligation to disclose them.

93.     According to the SEC's civil action against Li, "[i]n or about April or May 2010" Li spoke with an audit manager for Keyuan's auditor, who informed her that "the company was engaged in related party transactions and that those transactions should be separately identified and disclosed as related party transactions in the company's financial statements." The SEC claims that despite receiving this information, "Li failed to take reasonable steps to ensure that the company was properly identifying and disclosing related party transactions." (Exh. B, ¶ 33.)

94.     The SEC identified the following misconduct by Li:

(a) "[I]n August 2010, during the preparation of the second-quarter 2010 10-Q, the Chairman of Keyuan's Audit Committee asked Li to determine whether the company was engaged in related party transactions. He specifically noted that the company's loans were guaranteed by various unidentified third parties and asked whether any of those guarantors were related parties. Li thereafter followed up with Individual A, the company's Vice President of Accounting, as well as the company's Deputy Accounting Manager, and she was expressly told

that the loans were guaranteed by related parties. In that communication, Li acknowledged her understanding that the loans were guaranteed by related parties." (*Id.* ¶34.)

(b) "Li was also copied on four e-mails which attached summary schedules of Keyuan's bank debt. These schedules identified loan guarantors (including Tao, Chen, Wang, and entities affiliated with those individuals) that were related parties." (*Id.*, ¶35.)

(c) "The information provided to Li took place in an environment where the issue of related party disclosures warranted heightened scrutiny. For instance, in connection with the preparation of the second quarter 2010 10-Q, in July 2010, Keyuan's Audit Committee Chairman specifically asked Li for a 'detailed listing of all related party transactions.' The same Audit Committee Chairman directed Li on two subsequent occasions to ensure proper disclosure of related party transactions." (*Id.*, ¶36 .)

(d) At the same time other members of Keyuan's senior management submitted questionnaires, which specifically asked for the identification of related party transactions. "None of the questionnaires that Li received, however, disclosed any such transactions, including the related party loan guarantees of which she had been expressly made aware of and which the Audit Committee Chairman had asked her to identify." (*Id.*, ¶38.)

**Keyuan Files Materially False Financial Statements**

95.     On August 16, 2010, Keyuan filed with the SEC a materially false and misleading Form 10-Q signed by Tao and Li and separately certified by Tao and Li pursuant to Sarbanes-Oxley Act of 2002 ("SOX"), attesting to the accuracy of the 10-Q, and certifying that:

> this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report…

\*        \*        \*        \*        \*        \*        \*        \*        \*        \*        \*        \*

Any fraud, whether or not material, that involves management or other employees who
have a significant role in the registrant's internal control over financial reporting.

96.     The 10-Q filed on August 16, 2010 did not disclose any specific related party

transactions.

97.     On November 15, 2010, Keyuan filed with the SEC a materially false and

misleading Form 10-Q signed by Tao and Li and separately certified by Tao and Li pursuant to

SOX attesting to the accuracy of the 10-Q, and certifying that:

> this quarterly report does not contain any untrue statement of a material fact or omit to
> state a material fact necessary to make the statements made, in light of the circumstances
> under which such statements were made, not misleading with respect to the period
> covered by this quarterly report...

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

> Any fraud, whether or not material, that involves management or other employees who
> have a significant role in the registrant's internal control over financial reporting.

98.     On April 1, 2011, prior to the market open, trading in Keyuan's stock was halted.

The last trade was at $4.88/share.

99.     That same day, Keyuan filed a Form 12b-25 with the SEC announcing that it

would not be able to timely file its annual report for the fiscal year ended December 31, 2010 as

a result of unresolved issues raised by its independent auditor, KPMG, LLP.  The Form 12b-25

also stated that Keyuan's Audit Committee had engaged independent legal counsel and

commenced an investigation of issued raised by KPMG, LLP, (the "Investigation").  In relevant

part, the Form 12b-25 stated:

> In connection with the Registrant's financial statements as at December 31, 2010
> and for the fiscal year then ended, issues were raised by the Registrant's
> independent auditor, primarily relating to unexplained issues regarding certain
> cash transactions and recorded sales. The independent auditor reported these
> issues to the Registrant's Audit Committee.  The Registrant's Audit Committee
> has engaged independent legal counsel and commenced an investigation of the

issues raised by the Registrant's auditors. Inasmuch as completion of Registrant's 2010 financial statements is dependent, following completion of the Audit Committee's investigation, upon a satisfactory resolution of the issues raised and any other matters that may come to light as a result of further audit procedures, the Registrant was not able to complete its Form 10-K Annual Report by March 31, 2011. Although the Registrant believes that the Audit Committee shall undertake to complete its investigation as soon as practicable, and the Registrant shall use its best efforts to file the Annual Report by April 15, 2011, there can be no assurance that it will be able to do so by such date.

100. That same say, Keyuan also filed with the SEC an 8-K that reiterated that its independent auditor, KPMG, LLP, has raised issues to the Audit Committee, which had commenced the Investigation of those issues. The 8-K also stated that:

In light of the investigation by our Audit Committee, our auditors have informed us that there is a possibility that we may be required to make certain adjustments to certain of our previously issued financial statements, and that such previously issued financial statements may not be relied upon Although we are hopeful that the results of our Audit Committee's investigation will not require material adjustments or restatements of our historical financial statements, there can be no assurance that this will be the case.

As set forth above, our Audit Committee is conducting an investigation of the above referenced issues raised by our independent auditors during their audit of the financial statements that are to be included in the subject Annual Report. The investigation has just commenced and no conclusions have been reached by the Audit Committee. As it is possible that the issues raised may either result in material changes or restatements of our financial statements previously filed, or be resolved to the satisfaction of both the Audit Committee and the auditors, at this time, we cannot estimate the type of or amount of change that may occur in connection with the audit of our 2010 consolidated financial statements or any financial statements previously filed.

101. On May 31, 2011, Keyuan filed an 8-K with the SEC announcing that KPMG, LLP had resigned as Keyuan's independent auditor.

102. Subsequent to this announcement, Tao, on behalf of Keyuan, reassured Dragon State representatives that Keyuan was financially healthy and that any issues raised by KMPG would not impair the value of Dragon State's investment.

103.    On July 5, 2011, Keyuan filed an 8-K with the SEC stating that Keyuan had appointed GHP Horwath, P.C. as its new independent auditor.

104.    On July 11, 2011, Keyuan filed an 8-K with the SEC stating that on July 5, 2011, it had received a letter from NASDAQ indicating that based on its review of the Company and pursuant to NASDAQ Listing Rule 5101 and Listing Rule 5250 (c)(1), the NASDAQ staff determined that continued listing of Keyuan's securities on the NASDAQ Stock Market was unwarranted, and that Keyuan had appealed the determination and requested a hearing before a Hearings panel.

105.    On July 11. 2011, Keyuan filed an additional 8-K with the SEC stating that Keyuan had received a preliminary report from the Audit Committee's Investigation, and that with respect to the Company's unaudited sales to certain customers in fiscal year 2010.

> Stated in the report, the Investigation Team "reviewed selected documents at the Company's Beilun offices, consulted with an industry expert, visited a sample of customer locations throughout China, interviewed representatives of the customers and interviewed senior officers and personnel of the Company" and concluded, that:
>
> 1)    "...nothing has come to our attention to indicate that the Company has inappropriately accounted for the specific customer transactions we were able to test, other than the documentation issues notes above"1;
>
> 2)    "the Company-arranged interviews with selected customers supported that the customers transacted business with the Company in 2010";
>
> 3)    "in the documents that we have reviewed, we have found no documents reflecting any intent by the Company to misstate revenues;"
>
> 4)    "plant visit and document review by an expert in the petrochemical industry supports the finding that the plan is operating and producing petrochemicals at a quantity consistent with the revenues stated by the Company"; and
>
> 5)    "interviews with management and selected Company personnel were consistent with the above findings."

106.    Keyuan issued a press release concerning the above conclusions of the Investigation.

107.    On July 13, 2011, Keyuan filed an 8-K with the SEC clarifying the points it had made about the Investigation in the July 11, 2011 8-K:

> the Company would like to clarify the following points: (1) the final investigation has not been completed by the Investigation Team, (2) the Investigation Team was not in a position to determine that the Company's accounting for revenue from certain customers had been "accounted for appropriately," as these are determinations to be made by the Company and its independent auditors, (3) the interim report was issued by the Investigation Team to report its findings in connection with certain sales and customer transactions, neither Pillsbury, Deloitte, King & Wood nor the industry expert "separately verified the accuracy of information related to the Company's 2010 sales", and (4) the Investigation Team made no determination in the interim report that the Company is on "solid financial footing."

108.    That same day, Keyuan held a Shareholder Conference call.   Attending the conference call on behalf of Keyuan were Tao and Li.   A transcript of that telephone call filed with the SEC reflects that Li, on behalf of Keyuan, made several statements to the participants in an effort to assuage investors' concerns about Keyuan's business and the NASDAQ delisting notice:

> - "Demand for our products remains robust, and we continue to sign new customers, expand our capacity and enter new strategic partnerships, all of which, we believe will generate future growth. In fact, our preliminary results indicate that revenues in the first six months of 2011 have increased by approximately 17% to $292 million. Our balance sheet remains solid, and we continue to maintain strong relationships with our local banks."
>
> - "With regards to our NASDAQ listing, we recently received a delisting letter from NASDAQ primarily because of our inability to file audited financial statements on a timely basis, as well as the issues raised by KPMG. We have filed a request for appeal on the basis of Management's confidence that (1) we will regain compliance with our regulatory filings expeditiously and (2) the independent investigation will address the issues raised by KPMG and a full preliminary report will be issued upon completion of the investigation."

27

- "[W]e are confident that the final full report of the investigation team of the Audit Committee will be positive...."

109. On July 26, 2011, Keyuan filed an 8-K with the SEC stating that Keyuan had "received a notice from Nasdaq Hearings Panel that Nasdaq Hearings Panel granted a stay of the delisting of the Company from The Nasdaq Stock Market pending the Company's scheduled hearing to be held on August 25, 2011."

110. On August 24, 2011, Keyuan filed an 8-K with the SEC stating Keyuan received a notice from NASDAQ on August 17, 2011 stating that it did not comply with Listing Rule 5250 (c) (1) for continued listing due to the fact that Keyuan had not yet filed its Form 10-Q for the three months ended June 30, 2011 on time. NASDAQ also stated in the notice that it would take this delinquency along with Keyuan's previous failure to timely file the Form 10-K for fiscal year ended December 31, 2010 and the Form 10-Q for the three months ended March 31, 2011 into the consideration when determining whether to delist Keyuan.

111. On August 25, 2011, Keyuan filed an 8-K with the SEC stating that Keyuan had "appointed Mr. Fan Zhang to replace Mr. Weifeng Xue as Vice President of Accounting, effective as of August 20, 2011" and that Mr. Xue would "no longer have any further responsibility or authority with regard to the accounting or finance of the Company but has agreed to remain available to assist Mr. Zhang and the Company with the transition for a period of up to two months."

112. On October 6, 2011, Keyuan filed an 8-K with the SEC stating that the NASDAQ Hearings Panel had exercised its discretionary authority pursuant to NASDAQ Listing Rule 5101 to delist Keyuan's securities from the NASDAQ Stock Market and that NASDAQ would suspend trading in Keyuan's shares effective at the open of business on Friday, October 7, 2011.

113.   On October 7, 2011, after having been halted since April 1, 2011, Keyuan's stock began trading over-the-counter on the "Pink Sheets".   Keyuan's stock opened for trade at $1.05/share (down by $3.83/share) and eventually closed at $1.50/share, for a decline of $3.38/share or 69%.

114.   To this day, Keyuan's stock continues to be traded on Pink Sheet.  Since July 19, 2013, it has consistently traded between $0.58 and $1.20.  Pursuant to Pursuant to the Series B Certificate of Designations, Exhibit C to the SPA, all outstanding shares of the Series B Preferred Stock are subject to a mandatory conversion to common stock on September 28, 2013. The quotient for the conversion of the Series B Preferred Stock equal to the quotient of (i) the Series B Liquidation Preference Amount (defined as $3.75 per share) of the shares of Series B Preferred Stock divided by (ii) the Conversion Price (defined as $3.75 per share.) (as hereinafter defined).

115.   On October 18, 2011, Keyuan filed an 8-K with the SEC announcing that Ainchun Li "resigned her position as Chief Financial Officer of [Keyuan].  Keyuan retained Ms. Li as a consultant to assist with the transition and other tasks as directed by the Board of Directors."

116.   October 20, 2011, Keyuan filed its annual report for the fiscal year ended December 31, 2010.  In the report of Keyuan's accounting firm, GHP Horwath, P.C., which accompanied the filing, GHP Horwath reported that:

> The Company has significant transactions and relationships with related parties and certain other parties which are described in Note 24 to the consolidated financial statements. It is possible that the terms of these transactions may not be the same as those that would result from transactions among unrelated parties.

117.   Indeed, the 10-K revealed numerous previously undisclosed related party transactions, including:

| Name of parties | Relationship |
|---|---|
| Mr. Chunfeng Tao | Majority stockholder |
| Mr. Jicun Wang | Principal stockholder |
| Mr. Peijun Chen | Principal stockholder |
| Ms. Sumei Chen | Member of the Company's Board of Supervisors and spouse of Mr. Wang |
| Ms. Yushui Huang | Vice President of Administration, Ningbo Keyuan |
| Mr. Weifeng Xue | Vice President of Accounting, Ningbo Keyuan through August 2011 |
| Mr. Hengfeng Shou | Vice President of Sales, Ningbo Keyuan Petrochemical |
| Ningbo Kewei Investment Co., Ltd. (Ningbo Kewei) | A company controlled by Mr. Tao |
| Ningbo Pacific Ocean Shipping Co., Ltd (Ningbo Pacific) | 100% ownership by Mr. Wang |
| Ningbo Hengfa Metal Product Co., Ltd (Ningbo Hengfa, former name "Ningbo Tenglong") | 100% ownership by Mr. Chen |
| Shandong Tengda Stainless Steel Co., Ltd (Shandong Tengda) | 100% ownership by Mr. Chen |
| Ningbo Xinhe Logistic Co., Ltd (Ningbo Xinhe) | 10% ownership by Ms. Huang |
| Ningbo Kunde Petrochemical Co, Ltd. (Ningbo Kunde) | Mr. Tao's mother was a 65% nominee shareholder for Mr. Hu, a third party |
| Ningbo Jiangdong Jihe Construction Materials Store (Jiangdong Jihe) | Controlled by Mr. Xue's Brother-in-law |
| Ningbo Wanze Chemical Co., Ltd (Ningbo Wanze) | Mr. Tao's sister-in-law is the legal representative |
| Ningbo Zhenhai Jinchi Petroleum Chemical Co., Ltd (Zhenhai Jinchi) | Controlled by Mr. Shou |

118.   The related party transactions and amounts outstanding with the related parties as of and for the years ended December 31, 2010 and 2009 were summarized as follows:

|  | Year ended December 31, | |
|---|---|---|
|  | **2010** | **2009** |
| Sales of products (a) | $111,860,732 | $21,491,643 |
| Purchase of raw material (b) | $ 25,014,808 | $ 4,730,580 |
| Purchase of transportation services (c) | $ 3,659,000 | $ 1,437,411 |
| Credit line of guarantee provision for bank borrowings (d) | $161,994,300 | $86,499,900 |

| | | |
|---|---|---|
| Short-term financing from related parties (e) | $ 30,839,377 | $18,550,629 |
| Short-term financing to related parties (e) | $ 30,949,048 | $18,550,629 |
| Amount due from related parties (f) | $ 5,332,193 | $ 261,493 |
| Amount due to related parties (g) | $ 115,535 | $ 4,506,396 |

119.   The 10-K also identified the following relationships and transaction with other

parties:

| Name of parties | Relationship |
|---|---|
| Ningbo Litong Petrochemical Co., Ltd (Ningbo Litong) | Former 12.75% nominee shareholder of Ningbo Keyuan |
| Ningbo Jiangdong Haikai Construction Materials Store (Jiangdong Haikai) | Controlled by cousin of Mr. Weifeng Xue, Vice President of Accounting |
| Ningbo Jiangdong Deze Chemical Co., Ltd (Jiangdong Deze) | Controlled by cousin of Mr. Weifeng Xue, Vice President of Accounting |
| Ningbo Anqi Petrochemical Co., Ltd (Ningbo Anqi) | Controlled by cousin of Mr. Weifeng Xue, Vice President of Accounting |

120.   The transactions and amounts outstanding with these parties for the years ended

December 31, 2010 and 2009 were as follows:

| | Year ended December 31, | |
|---|---|---|
| | 2010 | 2009 |
| Sales of products (h) | $29,625,766 | $17,922,288 |
| Purchase of raw material (i) | $18,994,104 | $ 3,280,566 |
| Credit line of guarantee for bank borrowings (j) | $ - | $62,309,250 |
| Short-term financing from these parties (k) | $74,983,618 | $19,117,579 |
| Short-term financing to these parties (k) | $77,030,336 | $19,232,699 |
| Amounts due from these parties | $ 2,217,854 | $ 115,191 |
| Advance from these parties for sales | $ 110,134 | $ - |

121.   The 10-K also disclosed that the investigation, instigated by the Audit Committee,

had completed on September 28, 2011 and that it had identified possible violations of law:

The Investigation identified possible violations of PRC laws and U.S. Securities laws, including the maintenance of an off-balance sheet cash account that was used primarily to pay service providers and other Company related expenses. Total activity in the off-balance sheet cash account amounted to approximately $800,000 through December 31, 2010 with a net income statement effect of approximately $12,000, and $400,000 for the period from January 1, 2011 to March 31, 2011, with a net income statement effect of approximately $192,000, at which time the Company ceased its use. The Investigation identified certain other

31

issues that could result in potential violations of PRC or U.S. laws. The Company is working with its legal counsel to evaluate the matters identified in the Investigation and to determine the extent to which the Company may be exposed to fines and penalties. In addition, the Company has retained a Foreign Corrupt Practices Act ("FCPA") expert to review potentially relevant transactions and to assist the Company with the design and implementation of a detailed FCPA program. The Company has preliminarily concluded that the extent to which it may be exposed in the PRC is limited. However, management is currently unable to determine the final outcome of these matters and their possible effects on the consolidated financial statements.

122.   In the 10-K, Keyuan admitted additional possible violations of law:

[W]e engaged in certain related and other parties in short term financings to overcome the restrictions regarding the use of certain bank loans or to satisfy the banks' internal requirements to demonstrate the usage of the loans. Though we are current on our loan payments and as a general rule, the risk of prosecution and or civil liabilities is diminished if the loans have been repaid, we are advised that such practices may have been in violation of PRC banking laws.

123.   The 10-K also reflected that Defendants had lied to benefit the related parties.

Keyuan stated, in relevant part: "In the past we sometimes accommodated requests from our customers to change the name of products so that our customers could save on freight costs."

124.   Further, the 10-K revealed that Keyuan lacked adequate internal controls:

Following the Investigation, the Audit Committee identified, among other issues, inadequate disclosure and issues regarding internal control and procedures.... Notwithstanding the foregoing corrective actions, we cannot currently ensure that our controls and procedures will be effective at any time in the immediate future. Moreover, in order to improve our controls and procedures we anticipate that we will continue to incur significant costs. Failure to properly improve our controls and procedures could result in our failure to meet our reporting obligations, result in the restatement of our past financial statements, cause harm to our operating results, subject us to regulatory scrutiny and sanction, cause investors to lose confidence in our reported financial information and have a negative effect on the market price for shares of our common stock, all of which present significant risk to our investors.

125.   The 10-K also revealed that as a result of the Investigation, "management has concluded that the Company continues to have material weaknesses," including:

i.   Lack of sufficient knowledge of U.S. GAAP reporting by our existing accounting staff;

ii.  Lack of sufficient accounting staff which results in a lack of segregation of duties necessary for an efficient internal control system;

iii. Lack of a sufficient number of personnel appropriately qualified to perform control monitoring activities;

iv.  Lack of internal control consciousness and awareness by individuals responsible for certain key control activities, including: a) Lack of sufficient documentation of our existing financial processes, risk assessment and internal controls; b) Inadequate procedures for identifying and disclosing related party transactions; c) Inadequate controls with regard to certain banking and loan transactions; d) Inadequate disclosure and accounting for certain off balance sheet transactions.

v.   Inadequate training and training programs;

vi.  A Chief Financial Officer (CFO) for Chinese operations that did not report to the Company's CFO;

vii. Lack of Audit Committee oversight prior to its formation in July 2010; and

viii. Lack of necessary senior management oversight and monitoring of the accounting functions of the organization, and because the company completed a reverse merger in April 2010, senior management lacked the background, skills and experience to meet the reporting requirements of a US listed company.

126.   On October 20, 2011, Keyuan filed an 8-K with the SEC stating that on October 19, 2011, the Audit Committee and the Board of Directors of Keyuan, after consultation with management, determined that the financial statements in the Form 10-Qs for the periods ended June 30, 2010 and September 30, 2010 "could no longer be relied upon."

127.   The 8-K provided a summary of the anticipated restatements for the period ending June 30, 2010, including that Keyuan added "additional disclosures of [its] related party transactions to ensure that [it] include all of the disclosures required under US GAAP and the rules and regulations of the [SEC]". The 8-K also set forth that the other changes including, (1) changing its effective estimated tax rate to 25% and accounting for preferential tax treatment as

other income instead of accounting for it as a tax credit, (2) revising its calculation of basic earnings per share to include the shares of Series M preferred stock as participating securities under the two-class accounting method, and (3) reclassifying Series A preferred stock from permanent equity to temporary equity.

128.    The 8-K also provided a summary of the anticipated restatements for the period ending September 30, 2010, including that Keyuan added "additional disclosures of [its] related party transactions to ensure that [it] include all of the disclosures required under US GAAP and the rules and regulations of the [SEC]". The 8-K also set forth that the other changes including, (1) changing its effective estimated tax rate to 25% and accounting for preferential tax treatment as other income instead of accounting for it as a tax credit, (2) revising its calculation of basic earnings per share to include the shares of Series M preferred stock as participating securities under the two-class accounting method, (3) reclassifying Series A and Series B preferred stock from permanent equity to temporary equity, and (4) adopting a policy of recognizing a consumption tax refund receivable when the consumption tax had been paid and the relevant products had been used for production retroactive to January 2010 and accounting for retroactively in the period when the tax receivable was earned, resulting in Keyuan recording an estimated consumption tax refund amounting to $28,300,000, of which $25,110,00 has been recorded as deduction from cost of goods sold and $2,740,000 as deduction from inventories, respectively.

129.    On November 1, 2011, Keyuan filed is restated Form 10-Qs for the periods ended June 30, 2010 and September 30, 2010. The Form 10-Q/A3 for the period ended June 30, 2010 revealed related party transactions, which were set forth in the 10-K for the fiscal year ended December 31, 2010, including:

| Name of parties | Relationship |
|---|---|
| Mr. Chunfeng Tao | Majority stockholder |
| Mr. Jicun Wang | Principal stockholder |
| Mr. Peijun Chen | Principal stockholder |
| Ms. Sumei Chen | Member of the Company's Board of Supervisors and spouse of Mr. Wang |
| Ms. Yushui Huang | Vice President of Administration, Ningbo Keyuan |
| Mr. Weifeng Xue | Vice President of Accounting, Ningbo Keyuan |
| Mr. Hengfeng Shou | Vice President of Sales, Ningbo Keyuan Petrochemical |
| Ningbo Kewei Investment Co., Ltd. (Ningbo Kewei) | A company controlled by Mr. Tao |
| Ningbo Pacific Ocean Shipping Co., Ltd (Ningbo Pacific) | 100% ownership by Mr. Wang |
| Ningbo Hengfa Metal Product Co., Ltd (Ningbo Hengfa, former name "Ningbo Tenglong") | 100% ownership by Mr. Chen |
| Shandong Tengda Stainless Steel Co., Ltd (Shandong Tengda) | 100% ownership by Mr. Chen |
| Ningbo Xinhe Logistic Co., Ltd (Ningbo Xinhe) | 10% ownership by Ms. Huang |
| Ningbo Kunde Petrochemical Co, Ltd. (Ningbo Kunde) | Mr. Tao's mother was a 65% nominee shareholder for Mr. Hu, a third party |
| Ningbo Jiangdong Jihe Construction Materials Store (Jiangdong Jihe) | Controlled by Mr. Xue's Brother-in-law |
| Ningbo Wanze Chemical Co., Ltd (Ningbo Wanze) | Mr. Tao's sister-in-law is the legal representative |
| Ningbo Zhenhai Jinchi Petroleum Chemical Co., Ltd (Zhenhai Jinchi) | Controlled by Mr. Shou |

130.   The Form 10-Q/A3 also revealed the amounts outstanding with the related parties

as of and for the three months ended June 30, 2010 and 2009, summarized as follows:

| | Three months ended June 30, | |
|---|---|---|
| | **2010** | **2009** |

| | | |
|---|---|---|
| Sales of products (a) | $26,369,453 | $ - |
| Purchase of raw material (b) | $ - | $ - |
| Purchase of transportation services (c) | $ 1,593,080 | $ - |
| Credit line of guarantee provision for bank borrowings (d) | $ 4,400,700 | $43,238,150 |
| Short-term financing from related parties (e) | $ 2,934,200 | $ 5,247,767 |
| Short-term financing to related parties (e) | $ 2,934,200 | $ 5,247,767 |

| | Six months ended June 30, | |
|---|---|---|
| | **2010** | **2009** |
| Sales of products (a) | $ 47,186,862 | $ - |
| Purchase of raw material (b) | $ 5,734,319 | $ - |
| Purchase of transportation services (c) | $ 3,044,389 | $ - |
| Credit line of guarantee provision for bank borrowings (d) | $124,686,500 | $52,032,350 |
| Short-term financing from related parties (e) $ | 4,400,700 | $ 6,639,621 |
| Short-term financing to related parties (e) | $ 4,400,700 | $ 6,639,621 |

131. The Form 10-Q/A1 for the period ended September, 2010 revealed related party transactions, which were set forth in the 10-K for the fiscal year ended December 31, 2010, including:

| Name of parties | Relationship |
|---|---|
| Mr. Chunfeng Tao | Majority stockholder |
| Mr. Jicun Wang | Principal stockholder |
| Mr. Peijun Chen | Principal stockholder |
| Ms. Sumei Chen | Member of the Company's Board of Supervisors and spouse of Mr. Wang |
| Ms. Yushui Huang | Vice President of Administration, Ningbo Keyuan |
| Mr. Weifeng Xue | Vice President of Accounting, Ningbo Keyuan |
| Mr. Hengfeng Shou | Vice President of Sales, Ningbo Keyuan Petrochemical |
| Ningbo Kewei Investment Co., Ltd. (Ningbo Kewei) | A company controlled by Mr. Tao |
| Ningbo Pacific Ocean Shipping Co., Ltd (Ningbo Pacific) | 100% ownership by Mr. Wang |
| Ningbo Hengfa Metal Product Co., Ltd (Ningbo Hengfa, former name "Ningbo Tenglong") | 100% ownership by Mr. Chen |
| Shandong Tengda Stainless Steel Co., Ltd (Shandong Tengda) | 100% ownership by Mr. Chen |
| Ningbo Xinhe Logistic Co., Ltd (Ningbo Xinhe) | 10% ownership by Ms. Huang |
| Ningbo Kunde Petrochemical Co, Ltd. (Ningbo Kunde) | Mr. Tao's mother was a 65% nominee shareholder for Mr. Hu, a third party |

| | |
|---|---|
| Ningbo Jiangdong Jihe Construction Materials Store (Jiangdong Jihe) | Controlled by Mr. Xue's Brother-in-law |
| Ningbo Wanze Chemical Co., Ltd (Ningbo Wanze) | Mr. Tao's sister-in-law is the legal representative |
| Ningbo Zhenhai Jinchi Petroleum Chemical Co., Ltd (Zhenhai Jinchi) | Controlled by Mr. Shou |

132.   The Form 10-Q/A1 also revealed the amounts outstanding with the related parties

as of and for the three months ended September 30, 2010 and 2009 summarized as follows:

| | Three months ended September 30, | |
|---|---|---|
| | 2010 | 2009 |
| Sales of products (a) | $38,796,256 | $7,362,101 |
| Purchase of raw material (b) | $14,170,598 | $2,530,203 |
| Purchase of transportation services (c) | $    332,419 | $   313,349 |
| Credit line of guarantee provision for bank borrowings (d) | $33,097,500 | $4,367,225 |
| Short-term financing from related parties (e) | $12,479,262 | $5,421,870 |
| Short-term financing to related parties (e) | $12,839,420 | $5,421,870 |

36

| | Nine months ended September 30, | |
|---|---|---|
| | 2010 | 2009 |
| Sales of products (a) | $ 85,983,117 | $ 7,362,101 |
| Purchase of raw material (b) | $ 19,850,135 | $ 2,530,203 |
| Purchase of transportation services (c) | $  3,376,808 | $   313,349 |
| Credit line of guarantee provision for bank borrowings (d) | $158,132,500 | $47,844,275 |
| Short-term financing from related parties (e) $ | 14,415,800 | $12,061,491 |
| Short-term financing to related parties (e) | $ 14,505,958 | $12,061,491 |

133.   Keyuan admitted in a Form 8-K filed with the SEC on October 20, 2011 that

GAAP required Keyuan to disclose related party transactions that it failed to disclose to Dragon

State prior to its entry into the SPA.

134.   Keyuan admitted in the Form 8-K filed with the SEC on October 20, 2011 that the

failure to disclose the additional related party transactions was a material violation of GAAP

requiring Keyuan to restate its financial statements.

**The SEC Action**

135.   On February 28, 2013, the SEC filed an action against Keyuan and Li in the United States District Court for the District of Columbia alleging that between May 2010 and January 2011:

> Keyuan systematically failed to disclose in its SEC filings numerous material related party transactions between the company and its CEO and controlling shareholders, entities controlled by or affiliated with these persons, and entities controlled by Keyuan's management or their family members.  The related party transactions took the form of sales of products, purchases of raw materials, loan guarantees and short term cash transfers for financing purposes.

*SEC v. Keyuan et al.,* Case # 1:113-cv-00263 (D.D.C. Feb. 28, 2013).

136.   The SEC action also alleged that Li:

> Keyuan's CFO, who was hired to ensure the company's compliance with U.S. Generally Accepted Accounting Principles ("GAAP") and oversee the SEC reporting process, received information indicating that the company's CEO and controlling shareholders guaranteed loans for the company.  Li also encountered red flags that should have indicated to her that the company was not properly identifying or disclosing related party transactions.  Despite such knowledge, Li signed off on Keyuan's registration statements and quarterly reports that failed to disclose material related party transactions, as required by U.S. GAAP and/or Commission regulations.

*Id.*

137.   The SEC action alleged that by engaging in the conduct alleged in the complaint, that Keyuan and Li violated, directly or indirectly, the federal securities laws.  *Id.*

138.   On February 28, 2013, the SEC announced that Keyuan had agreed to pay a $1 million penalty and Li agreed to pay a $25,000 penalty to settle the SEC's charges.  Keyuan and Li consented to the entry of a judgment permanently enjoining them from violations of the respective provisions of the Securities Act and Exchange Act and Li also agreed to be suspended from appearing or practicing as an accountant before the SEC with the right to apply for

reinstatement after two years. The Court signed a Final Judgment against Keyuan and Li on July 1, 2013, which Final Judgment was filed on July 2, 2013.

**Additional Allegations of Scienter**

139.   Keyuan's 10-Qs failed to disclose millions of dollars in related party sales between Keyuan and companies controlled by Tao.

140.   Numerous related party sales were to entities owned and controlled by Tao or in which his family has a financial interest.

141.   Related party sales to Tao were over $21 million and $100 million in 2009 and 2010, respectively. These amounts represented nearly 31% and 20% of Keyuan's sales in 2009 and 2010. Keyuan also made undisclosed related party purchases of raw materials from Tao in 2009 and 2010, representing 36% and 47% of the value of Keyuan's entire inventory for those years, respectively.

142.   The significance of the related party transactions support a strong inference of scienter. There were more than 16 different related party entities involved in the undisclosed related party transactions where Tao, or companies controlled by Tao, were parties to the related party transactions.

143.   The SPA contained representations and warranties that Keyuan's financial statements had been prepared in accordance with GAAP and that, except as set forth in the financial statements, Keyuan had not engaged in related party transaction. (Exh. A, § 2.1(f), (u).)

144.   The SPA contained a covenant that Keyuan would keep adequate records and books of account with entries made in accordance with GAAP. (*Id.*, § 3.4.)

145.   Tao negotiated the terms of, and signed, the SPA. As a result, he had knowledge of Keyuan's obligations to disclose related party transactions in its financial statements.

## FIRST CLAIM FOR RELIEF

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Keyuan and Tao

146.   Plaintiff Dragon State repeats and realleges each and every allegation contained in paragraphs 1 through 145 as if fully set forth herein.

147.   Dragon State is a purchaser of Keyuan securities.

148.   As set forth fully above, Keyuan and Tao carried out a plan, scheme and course of conduct that was intended to and did deceive Dragon State as to the true value of Keyuan's preferred stock and warrants ("Keyuan's Securities") that Dragon State purchased pursuant to the SPA.

149.   Keyuan and Tao deceived Dragon State in connection with its purchase of Keyuan Securities by intentionally or recklessly providing false information to Dragon State about Keyuan's business operations and financial condition.   The false information included false financial statements, which omitted material information about compliance with GAAP including but not limited to the failure to disclose related party transactions and possible violations of law.   The false information included specific representations, warranties and covenants made by Keyuan in the SPA.

150.   Keyuan, Tao, and Li had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that it failed to ascertain and to disclose such facts, even though such facts were available to Keyuan. Keyuan's material misrepresentations and/or omissions were done knowingly, intentionally, or recklessly and for the purpose and effect of concealing Keyuan's business operations and financial condition from Dragon State and concealing the true value of the Keyuan Securities.

151.    Tao signed and certified the accuracy of the two materially false and misleading Form 10-Qs that he knew or should have known omitted material information.  Tao and/or companies controlled by Tao, engaged in related party transactions, which Keyuan, through Tao, intentionally failed to disclose in Keyuan's financial statements.  Tao directly participated in the negotiations of the terms of the SPA with Dragon State on behalf of Keyuan, including the Keyuan's representations and warranties in the SPA.  Tao signed the SPA on behalf of Keyuan.  Tao was provided with or had unlimited access to copies of Keyuan's reports, press releases, public filings and other statements alleged by Dragon State to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

152.    Dragon State, without knowledge of the truth, relied upon the false information that Keyuan and Tao provided about Keyuan's business operations and financial condition, including its materially false financial statements and SPA representations and warranties, in connection with its purchase of Keyuan's Securities.

153.    In reliance on the information provided by Keyuan and Tao to Dragon State, Dragon State purchased Keyuan's Securities for more than the true value of Keyuan's Securities.

154.    As a result of Keyuan's false financial statements and resulting inability to timely file its 10-K for year ended December 31, 2010 and the eventual need to restate its two prior 10-Qs, trading in Keyuan's stock was halted on April 1, 2011.  After more than 6 months, on October 7, 2011 Keyuan's stock began trading over-the-counter on the "Pink Sheets". Keyuan's stock opened for trade at $1.05/share (down by $3.83/share) and eventually closed at $1.50/share, for a decline of $3.38/share or 69%.

155.    As further disclosures were made the stock price continued to decline.  On Friday, September 27, 2013, the day before what would have been the day of the mandatory conversion under the SPA, had it not been for the Tolling Agreement, Keyuan's stock closed at $0.68.  The warrants, which have an initial exercise price of $4.50 for the Series C Warrants and $5.25 for the Series D Warrants, are worthless.

156.    Dragon State would not have purchased Keyuan's Securities had it known of Keyuan's misrepresentations and omissions.

157.    Dragon State has been damaged by Keyuan's violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, for which money damages are inadequate.  Accordingly, Dragon State seeks rescission of the SPA and the return of its $20 million.

158.    In the alternative, Dragon State seeks money damages in an amount to be determined at trial but not less than $20 million.

### SECOND CLAIM FOR RELIEF

#### Violation of Section 20(A) of the
#### Exchange Act Against Tao

159.    Dragon State repeats and realleges each and every allegation contained in paragraphs 1 through 158 as if fully set forth herein.

160.    As set forth more fully above, Keyuan violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

161.    Tao controlled Keyuan within the meaning of Section 20(a) of the Exchange Act as alleged herein.  Tao was the Chairman of the Board and Chief Executive Officer of Keyuan at the time of the transactions at issue and a member of Keyuan's management team.  Tao indirectly controls approximately 34.52% of Keyuan's common stock.  Tao, by virtue of his

responsibilities and activities as a senior officer and/or director of Keyuan, was privy to and participated in the creation, development and reporting of the Keyuan's financial condition. Tao enjoyed significant personal contact and familiarity with other high-level executives, directors, and/or agents and was advised of and had access to other members of Keyuan's management team, internal reports and other data and information about the Keyuan's finances, operations, and sales at all relevant times. In particular, Tao had direct and supervisory involvement in the day-to-day operations of Keyuan and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

162. Further, Tao signed and certified the accuracy of the two materially false and misleading Form 10-Qs that he knew or should have known omitted material information. Tao and/or companies controlled by Tao, engaged in related party transactions, which Keyuan, through Tao, intentionally failed to disclose in Keyuan's financial statements. Tao directly participated in the negotiations of the terms of the SPA with Dragon State on behalf of Keyuan, including the Keyuan's representations and warranties in the SPA. Tao signed the SPA on behalf of Keyuan. Tao was provided with or had unlimited access to copies of Keyuan's reports, press releases, public filings and other statements alleged by Dragon State to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

163. Tao was a culpable participant in Keyuan's fraud because, among other things, he intentionally or with reckless disregard for the truth: (a) provided information to Dragon State on behalf of Keyuan concerning business operations and financial condition that he knew to be false; (b) signed and certified the accuracy of the two false and misleading Form 10-Qs that

omitted related party transactions in which Tao participated; (b) negotiated Keyuan's representations and warranties in the SPA that he knew to be false; and (c) signed the SPA on behalf of Keyuan knowing its representations and warranties to be false.

164.    By virtue of his position as a controlling person, Tao is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Keyuan's and Tao's wrongful conduct, Dragon State purchased Keyuan's Securities for more than the true value of Keyuan's Securities and suffered damages, as set forth above.

165.    Dragon State has been damaged by Tao's violations of Section 20(A) of the Exchange Act and seeks money damages in an amount to be determined at trial but not less than $20 million.

### THIRD CLAIM FOR RELIEF

### Common Law Fraud Against Keyuan and Tao

166.    Dragon State repeats and realleges each and every allegation contained in paragraphs 1 through 165 as if fully set forth herein.

167.    In connection with Dragon State's purchase of Keyuan's Securities under the SPA, Keyuan provided Dragon State with information concerning its business operations and financial condition that omitted and misrepresented material facts, including but not limited to omissions about related party transaction in its financial statements, possible violations of U.S. law, and inadequate internal controls.

168.    In connection with Dragon State's purchase of Keyuan's Securities under the SPA, Keyuan made material false representations and warranties to Dragon State.

169. Keyuan and Tao had actual knowledge that the information it provided to Dragon State concerning its business operations and financial condition omitted and misrepresented material facts.

170. Keyuan and Tao had actual knowledge that the representations and warranties were materially false when made.

171. Keyuan and Tao provided Dragon State with information concerning its business operations and financial condition that omitted and misrepresented material facts with the intent to deceive Dragon State as to the true business operations and financial conditions of Keyuan and the true value of the Keyuan Securities.

172. Keyuan and Tao provided Dragon State with information concerning its business operations and financial condition that omitted and misrepresented material facts with the intent (a) to deceive Dragon State as to the true business operations and financial conditions of Keyuan and the true value of the Keyuan Securities; and (b) with the intent that Dragon State would rely upon the accuracy of the information in agreeing to enter into the SPA.

173. Keyuan made representations and warranties signed by Tao with knowledge of falsity to Dragon State in the SPA with the intent: (a) to deceive Dragon State as to the true business operations and financial conditions of Keyuan and the true value of the Keyuan Securities; and (b) with the intent that Dragon State would rely upon the accuracy of the information in agreeing to enter into the SPA.

174. Dragon State relied on the truth of the representations and warranties.

175. Dragon State's reliance on the information provided by Keyuan was justifiable. Dragon State engaged in reasonable due diligence and it did not discover the falsity of the representations and warranties.

176.    Dragon State would not have entered into the SPA but for Keyuan's financial disclosures and representations and warranties.

177.    Dragon State has been damaged by Keyuan's and Tao's fraud for which money damages are inadequate.  Accordingly, Dragon State seeks rescission of the SPA and the return of its $20 million.

178.    In the alternative, Dragon State seeks money damages in an amount to be determined at trial but not less than $20 million.

### FOURTH CLAIM FOR RELIEF

#### Aiding and Abetting Fraud Against Tao

179.    Dragon State repeats and realleges each and every allegation contained in paragraphs 1 through 178 as if fully set forth herein.

180.    As set forth above, Keyuan perpetrated a fraud against Dragon State.

181.    By virtue of Tao's position as the Chairman of the Board and Chief Executive Officer of Keyuan at the time of the transactions at issue and a member of Keyuan's management team, and his involvement in the negotiations concerning the SPA, Tao had actual knowledge of the misrepresentations and omissions of material facts set forth above, or acted with reckless disregard for the truth in that Tao failed to ascertain and to disclose such facts, even though such facts were available to him.

182.    Tao affirmatively assisted Keyuan make misrepresentations to Dragon State as to the truth and accuracy of Keyuan's financial statements and other information provided to Dragon State to induce it to enter into the SPA.  Tao affirmatively assisted Keyuan conceal, among other things, the related party transactions and possible violations of U.S. law from Dragon State.

46

183.    Tao affirmatively assisted Keyuan make representations and warranties to Dragon State in the SPA that he knew to be false to induce it to enter into the SPA, as set forth in paragraphs 32-60 *supra*.

184.    Subsequent to Keyuan's filing an 8-K with the SEC announcing that KPMG, LLP had resigned as Keyuan's independent auditor, Tao directly reassured Dragon State representatives that Keyuan was financially healthy and that any issues raised by KMPG would not impair the value of Dragon State's investment.

185.    Dragon State would not have entered into the SPA but for Keyuan's financial disclosures and representations and warranties.

186.    Dragon State has been damaged as a result of Tao's aiding and abetting Keyuan's fraud and seeks money damages in an amount to be determined at trial but not less than $20 million.

## FIFTH CLAIM FOR RELIEF

### Aiding and Abetting Fraud Against Li

187.    Dragon State repeats and realleges each and every allegation contained in paragraphs 1 through 186 as if fully set forth herein.

188.    As set forth above, Keyuan perpetrated a fraud against Dragon State.

189.    By virtue of Li's position as the Chief Financial Officer of Keyuan from May of 2010 until her resignation from Keyuan on October of 2011, and her status as a Certified Public Accountant, Li was aware of Keyuan's obligation to disclose related party transactions and that the financial statements omitted material information about third party transactions.  Li had actual knowledge of the misrepresentations and omissions of material facts set forth above, or

acted with reckless disregard for the truth in that Li failed to ascertain and to disclose such facts, even though such facts were available to her.

190.    Li signed and certified the accuracy of the two materially false and misleading Form 10-Qs.

191.    Li affirmatively assisted Keyuan to make misrepresentations to Dragon State as to the truth and accuracy of Keyuan's financial statements and other information provided to Dragon State to induce it to enter into the SPA.  Li affirmatively assisted Keyuan to conceal, among other things, the related party transactions and possible violations of U.S. law from Dragon State.

192.    Dragon State would not have entered into the SPA but for Keyuan's financial disclosures and representations and warranties.

193.    Dragon State has been damaged as a result of Li's aiding and abetting Keyuan's fraud and seeks money damages in an amount to be determined at trial but not less than $20 million.

### SIXTH CLAIM FOR RELIEF

### Breach of Representations and Warranties Against Keyuan

194.    Dragon State repeats and realleges each and every allegation contained in paragraphs 1 through 193 as if fully set forth herein.

195.    The SPA is a valid and binding agreement between Dragon State and Keyuan.

196.    Dragon State has performed all of its obligations under the SPA.

197.    Keyuan induced Dragon State to enter into the SPA and to purchase Keyuan's Securities for $20 million by making extensive representations and warranties that, as set forth more fully above: (a) its Form 10-Ks and Form 10-s disclosed any existing related party

transactions; (b) its Form 10-Ks and Form 10-Qs complied in all material respects with the requirements of the Exchange Act; (c) its Form 10-Ks and Form 10Q-s did not omit any material facts required to be stated; (d) the financial statements in its Form 10-Ks and Form 10-Qs had been prepared in accordance with GAAP; (e) Keyuan maintain a system of internal accounting controls sufficient to provide assurances that transactions in its financial statements were recorded in conformance with GAAP; and, (f) the business of Keyuan was not being conducted in violation of any federal, state, local or foreign governmental law.

198.   Keyuan's representations and warranties were material to Dragon State's decision to enter into the SPA and purchase the Securities for $20 million and Keyuan induced Dragon State to purchase Keyuan's Securities for $20 million based upon its representations and warranties.

199.   As set forth more fully above, Keyuan materially breached its representations and warranties, including but not limited to Sections 2.1(f), (g), (h), (i), (n), (p), (s), (t), (u), (v), (y), (cc), (ff), (jj) and (mm) of the SPA, by, among other things: (a) filing materially false financial statements that failed to disclose related party transactions; (b) failing to file financial statements that conformed with GAAP; (c) engaging in practices that could be in violation of U.S. laws; and (d) failing to implement adequate internal controls.

200.   These breaches had a material and adverse effect on the value of the securities purchased by Dragon State.

201.   Dragon State has been damaged as a result of Keyuan's breaches of representations and warranties, for which money damages are inadequate.  Accordingly, Dragon State seeks rescission of the SPA and the return of its $20 million.

202.   In the alternative, Dragon State seeks money damages in an amount to be determined at trial but not less than $20 million.

### SEVENTH CLAIM FOR RELIEF

#### Breach of Contract Covenants Against Keyuan

203.   Dragon State repeats and realleges each and every allegation contained in paragraphs 1 through 202 as if fully set forth herein.

204.   The SPA is a valid and binding agreement between Dragon State and Keyuan.

205.   Dragon State has performed all of its obligations under the SPA

206.   As an inducement to Dragon State to enter into the SPA, Keyuan also made certain covenants for the benefit of Dragon State, including that Keyuan would: (a) comply in all respects with its reporting and filing obligations under the Exchange Act, (b) comply with all applicable laws, rules and regulations; (c) keep records and books of account, in which complete entries would be made in conformance with GAAP, (d) timely file all reports with the SEC; and (e) be in compliance with SOX.  (Ex. 1 §§ 3.2-3.4.)

207.   Keyuan has materially breached its covenants under Sections 3.2. 3.3, 4.3, 3.12, and 3.17 of the SPA by, among other things (a) filing materially false financial statements; (b) engaging certain related and other parties in short term financings to overcome the restrictions regarding the use of certain bank loans or to satisfy the banks' internal requirements to demonstrate the usage of the loans; (c) failing to keep its records and books in accordance with GAAP; (d) failing to timely file its 10-K for the year ending December 30, 2010; and (e) for the aforementioned reasons, failing to comply with SOX.

208.    As a result of Keyuan's breaches of covenants, the market value of the stock has been significantly impaired well below the SPA Conversion Price and the Series C and D warrants have no value.

209.    By reason thereof, Dragon State has been injured by being denied the value of its bargain.

210.    Dragon State has been damaged as a result of Keyuan's breach of the SPA covenants, for which money damages are inadequate.    Accordingly, Dragon State seeks rescission of the SPA and the return of its $20 million.

211.    In the alternative, Dragon State seeks money damages in an amount to be determined at trial but not less than $20 million.

## EIGHTH CLAIM FOR RELIEF

### Indemnification

212.    Dragon State repeats and realleges each and every allegation contained in paragraphs 1 through 211 as if fully set forth herein.

213.    Keyuan has breached numerous representations, warranties, and covenants that have caused and will continue to cause Dragon State damage

214.    Pursuant to the SPA, Dragon State is entitled to be indemnified by Keyuan from and against any and all losses, liabilities, deficiencies, costs, damages and expenses (including, without limitation, reasonable attorneys' fees, charges and disbursements) incurred by Dragon State as a result of any breach of the representations, warranties or covenants made by Keyuan.

51

## NINTH CLAIM FOR RELIEF

### Injunctive Relief

215.    Pursuant to the Dragon State repeats and realleges each and every allegation contained in paragraphs 1 through 214 as if fully set forth herein.

216.    Pursuant to the Series B Certificate of Designations, Exhibit C to the SPA, the Tolling Agreement, and the amendment to the Tolling Agreement, all outstanding shares of the Series B preferred stock are subject to a mandatory conversion to common stock on October 31, 2014.

217.    As set forth herein, Dragon State seeks rescission of the SPA.   Dragon State's rights to rescission of the SPA will be irreparably harmed if Keyuan is allowed to convert the Series B preferred stock to common stock on October 31, 2014.

218.    Dragon State has a substantial likelihood of success on the merits in that, as set forth herein, Keyuan's restatements of its 10-Qs and admissions of inadequate internal controls demonstrates that Keyuan violated the Exchange Act, committed fraud, breached representations and warranties, and breached the SPA covenants.

219.    The interests of justice will be served by the Court enjoining Keyuan from converting Dragon State's Series B preferred stock into common stock pending resolution of this action.

### PRAYER FOR RELIEF

**WHEREFORE,** Dragon State prays for relief and judgment on each of its claims for relief as against all Defendants as follows:

1) On the First Claim for Relief against Keyuan and Tao for rescission of the SPA and an award to Dragon State of money damages for the total amount of $20 million paid by Dragon State for the Keyuan Securities;

2) On the Second Claim for Relief against Tao for money damages in an amount to be determined at trial but not less than $20 million;

3) On the Third Claim for Relief against Tao for money damages in an amount to be determined at trial but not less than $20 million;

4) On the Fourth Claim for Relief against Tao for money damages in an amount to be determined at trial but not less than $20 million;

5) On the Fifth Claim for Relief against Li for money damages in an amount to be determined at trial but not less than $20 million;

6) On the Sixth Claim for Relief against Keyuan for rescission of the SPA and an award to Dragon State of money damages for the total amount of $20 million paid by Dragon State for the Keyuan Securities;

7) On the Seventh Claim for Relief against Keyuan for rescission of the SPA and an award to Dragon State of money damages for the total amount of $20 million paid by Dragon State for the Keyuan Securities;

8) On the Eighth Claim for Relief for an order of indemnification against Keyuan from and against any and all losses, liabilities, deficiencies, costs, damages and expenses (including, without limitation, reasonable attorneys' fees, charges and disbursements) incurred by the Dragon State as a result of any breach of the representations, warranties or covenants made by Keyuan;

9) On the Ninth Claim for relief for an injunction enjoining Keyuan from converting Dragon State's Series B preferred stock into common stock pending resolution of this action;

10) For an order of prejudgment interest and attorneys fees; and

11) For an order awarding Dragon State such other relief as the Court deems just and proper.

Dated: March 27, 2015
      New York, New York

GREENBERG TRAURIG, LLP

By: _____

     Ronald D. Lefton
     Caroline J. Heller
     MetLife Building
     200 Park Avenue
     New York, New York 10166
     Telephone: (212) 801-9200
     Facsimile:  (212) 801-6400

*Attorneys for Plaintiff Dragon State*
*International Limited*

54